57 CCPA

### Application of John S. BOZEK.
### Patent Appeal No. 8173.

United States Court of Customs and Patent Appeals.

Nov. 6, 1969.

Mason, Porter, Diller & Brown, Washington, D. C., attorneys of record, for appellant. Charles E. Brown, Vincent L. Ramik, Washington, D. C., of counsel.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents. Fred W. Sherling, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, GANEY, Judge, sitting by designation, and ALMOND, BALDWIN and LANE, Judges.

BALDWIN, Judge.

This is an appeal from the Patent Office Board of Appeals decision, adhered to on reconsideration, which affirmed the rejection of claims 2, 4, 5, 7, and 9–14 in appellant's application,[1] as unpatenta-

1. Serial No. 345,615, filed Feb. 18, 1964, for "Non-Flipping Beer Can End".

ble over Speidel[2] in view of Henchert[3] under 35 U.S.C. § 103. The board reversed the rejection of three claims.

### The Invention

As stated in appellant's specification, the invention relates to "a can end of the easy opening type adapted for the dispensing of beverages including beer, wherein an end panel of the can end is provided with a score line which defines a tearout portion through which the beverage is poured". The specification does not state explicitly how the score line is provided, but in his briefs to the board and this court, appellant has indicated that the score line is formed by compressing the material of the can end in a die-stamping operation, as opposed to a cutting or metal-removing operation. This compression causes a flowing of the metal in directions away from the score line, thus causing a gathering of metal within the tear-out portion defined by the score line and a generally circumferential bulging of the metal outwardly from the score line. Appellant alleges that this results in the creation of "two major disadvantages." Quoting from the application:

> In the first place, the excess metal effects a crowding of the remaining metal of the end panel and causes the end panel to be readily flipped from one side to the other of the normal median plane of the end panel with the result that a premature rupture of the end panel along the score line may result. The second disadvantage is that the excess metal which causes the bulging of the end panel also tends to flip up the free end of the pull tab which is attached to the tear-out portion whereas the pull tab should remain as flat as possible against the end panel so as to not interfere with

the stacking of the can ends or the seaming of the can ends to can bodies.

Appellant proposes to solve the problems he describes by providing a circumferentially extending rib in the end panel, which rib is offset from the plane of the end panel in either an upward or downward direction. This rib, or groove as it may be, serves, according to appellant, to absorb the excess metal resulting from the forming of the score line,[4] while at the same time functioning as a circumferential reinforcement to stiffen the entire end panel. Appellant states that the rib may extend continuously around the circumference of the can end or it may be in a C-shape with the ends terminating closely adjacent to the opposite sides of the tear-out portion.

It has been agreed by the parties that claims 2 and 9 are representative of the claimed invention and any decision regarding these claims will be determinative as to the others. Claim 2 reads:

> 2. An easy opening end particularly adapted for use on beverage cans, said end including an end panel, a single continuous score line formed in said end panel and defining a removable tear-out portion which extends generally radially from the central portion of said end panel to the periphery of said end panel, and circumferential rib means in said end panel, said rib means being generally C-shaped in outline and having opposite ends terminating adjacent said tear-out portion and absorbing excess material which resulted from the forming of said score line whereby undesired bulging of said end panel is prevented.

Claim 9 contains slightly different language but the only significant difference between that claim and claim 2 is the recitation that the "rib means" or "off-

---

2. U.S. Patent 2,112,231, issued March 29, 1938.

3. Canadian Patent 484,099, issued June 17, 1952.

4. It appears that the invention requires that the rib (or groove), in order to ac-

tually function so as to absorb the excess metal generated by the formation of the score line, be formed simultaneously with or after the formation of the score line. The significance of this point will be brought out later on.

set portion" (as it is called in claim 9) extends across the tear-out section.

### The References

Speidel discloses numerous forms of easy-opening can ends each having a tear-out portion which, according to the patent disclosure, "may be of any desired shape and which is defined by an area or zone of compressed metal, produced either by coining, stamping, [or] rolling". The tear-out portion has a pull member spot welded, soldered, riveted, or otherwise secured to one end "in such a manner that when pulled out-wardly, the hardened metal is fractured so that the tear strip or section may be torn from one end to the other along the zone of compressed metal, the entire operation being performed with ease and in a fraction of a second." The patent also discloses, as a "further feature of the invention", the formation of "one or more reinforcing ribs either along the zones of compressed metal * * *, or at such locations as will hold the cover or wall of the container relatively stiff while the strip is being torn * * *". The embodiments of the Speidel invention primarily relied upon by the Patent Office are reproduced below:

*Fig. 16*

[A221]

*Fig. 17*

The technique of manufacturing the can ends shown above is described by Speidel with the aid of the following illustrations:

*Fig. 5*

*Fig. 6*

*Fig. 8*

*Fig. 8ª*

[A222]

Figure 5 shows a cross section of a can end being formed between the surfaces of a stamping die. Figures 6, 8 and 8a illustrate alternative designs for the section of the die which produces the score lines defining the tear-out portion (the area within the rectangle outlined on the left side of figure 5).

In the manufacturing process, according to the patent disclosure, a blank, or stock piece of sheet metal is inserted between the dies 11 and 12 and the can end is stamped out in a single operation. "During the operation the annular zones of metal lying between the surface 18 of die 11 and the shoulders 26 and 27 of the die 12, are subjected to a coining treatment which effects a compression of the metal, as shown in Fig. 6, and as a result of this treatment the parallel bands or zones of metal 30 and 31 lying above the shoulders 26 and 27, are physically altered and become hard and dense, having a bursting and tensile strength not substantially less, if any, than that of the unaltered metal, but a tearing strength which is considerably less than that of the unaltered metal." In the same operation, the "reinforcing corrugations 6" and "a peripheral flange 7" are formed.

The Henchert patent is drawn to a three-piece closure for containers which includes a can top having a central opening, a cover designed to frictionally fit within the central opening of the can top and a metal sealing ring to render the can tamper-proof. The sealing ring extends around the outer edge of the can top, extending inward toward the center only enough to overlap and secure the friction cover. The sealing ring is made readily rupturable by forming two parallel score lines across the ring and providing a pull tab at that point. The score lines extend across an upstanding, circumferential rib in the sealing ring which is placed there according to the patent disclosure "for stacking purposes".

### The Rejection

The examiner rejected the appealed claims as unpatentable over Speidel in view of Henchert under 35 U.S.C. § 103. His position was well summarized as follows:

(1) Applicant argues Speidel has no teaching of the ribs functioning in a manner to absorb excess metal material which results from the forming of score lines. This functional limitation is inherent in the structure of Speidel and would function in the same manner as applicant's ribs. The ribs could extend upwardly or downwardly, as desired. * * *

(2) The single score line that defines the tear out portion is a common feature in the art. To employ a single continuous score line instead of two would be a mere matter of choice.

(3) Claims 9, 10, 13 and 14 recite rib or ribs extending across the tear out portion. This structure is old as shown by Henchert and it would be obvious to one having ordinary skill in the art to extend the ribs 42 and 51 of Speidel if they so desired or found necessary.

The board recognized that the examiner's rejection was separable since it pointed out that the Henchert patent was only pertinent to claims 9, 11, 13 and 14 which make reference to the rib extending across the tear-out portion. It went on to state, however, that "we are of the opinion that the rejection of the other claims over Speidel is proper under 35 U.S.C. § 103 since differences thereover are involved, as noted in paragraphs (1) and (2) of the Examiner's Answer, supra, and as argued by the appellant." The rejection of claims 2, 4, 5, 7, 10 and 12 was affirmed using the following reasoning:

* * * We see nothing unobvious, but only a matter of choice between known alternatives in the art on the part of the routineer in the art, in replacing the double score line type tab shown in Figs. 16 and 17 of Speidel with the conventional single score line tab.

Speidel further discloses the use of either one (51, Fig. 17) or two (41, 42,

Fig. 16) C-shaped reinforcing ribs terminating adjacent to the tear out portion. As a broad proposition, in the absence of new relationships and new utilities, whether the ribs extend upwardly or downwardly is deemed an arbitrary matter of choice in design, as either would reinforce the end panel.

\* \* \* \* \* \*

We are further of the opinion that while most of the displaced metal would flow into the mold cavity 25 (Fig. 8), some will unavoidably flow to the right of said cavity and go toward the formation of reinforcing rib 6. Thus, the forming of the reinforcing rib 6 will absorb excess metal resulting from the forming of the score line as claimed, albeit not all of the displaced metal.

With regard to the claims directed to the extension of the ribs across the tear-out section, the board concluded:

\* \* \* [W]e are not convinced by appellant's arguments that Henchert would not have suggested the extension of the Speidel ribs in that manner, even though rib 20 of Henchert is basically a stacking rib. Accordingly, the patentability of these claims will be resolved on the same basis as claims 2, 4, 5, 7 and 12, i. e., as to whether the fabricating function attributed to the reinforcing rib or ribs of absorbing the excess material which resulted from the forming of the score line patentability [sic] distinguishes over Speidel.

Having decided that the claims did not patentably distinguish, the rejection was affirmed.

### Opinion

Appellant has taken the position before the board of appeals and before this court, that the score lines in the Speidel can top are formed in such a manner as to *preclude* any flowing of metal in directions away from the score lines. He argues that:

There is therefore nothing in the *entire* Speidel disclosure which supports the Board's "opinion" that some of the displaced metal will "unavoidably flow to the right of said cavity (25) and go toward the formation of reinforcing rib 6." In fact, the Speidel patent is diametrically opposite to appellant's invention because by an undistorted interpretation thereof any absorption of metal occurs *only* in the tear strips and not outboard thereof by "rib means", as claimed.

Since the "rib means" of the rejected claims is given the limitation of "absorbing excess material which resulted from the forming of said score line,"[5] appellant contends that a structural significance is thus created in accordance with the third paragraph of 35 U.S.C. § 112,[6] which distinguishes the claims over the Speidel disclosure.

Appellant also objects to the use of the Henchert patent, arguing that it is "non-analogous art" and that its disclosure should not therefore be combined with that of Speidel to make the second embodiment, where the rib means extends across the score lines, obvious.

The solicitor, besides arguing in support of the board's conclusion of obviousness, contends that appellant's "means \* \* \* absorbing excess material" is not a "means \* \* \* for performing a specified function" as permitted by 35 U.S.C. § 112. He states:

The function of the rib means in absorbing excess material is performed in the process of manufacturing the can end, and the only function of the

5. This is the language of claim 2. Claim 9 is similar in reciting "means absorbing said excess material and stiffening said panel against flexing."

6. An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure material, or acts described in the specification and equivalents thereof.

rib means in the finished article claimed by appellant is to strengthen the can end.

■ Upon a careful study of the references and a thorough consideration of the record and arguments of counsel, we have decided to affirm the decision of the board. Initially, we point out that we agree with the solicitor that appellant has improperly relied on the third paragraph of 35 U.S.C. § 112. It seems to us that the only rational way in which 35 U.S.C. § 112 can be interpreted is to require that the "means * * * for performing a specified function", in order to be accorded structural significance, be a means which possesses a *presently existing* function or a *presently existing capability* to perform a function. The rib means of the instant claims, if it performs the recited function of absorbing excess material resulting from the formation of the score line at all, performs that function *during* the manufacturing process. Thus, *as he has claimed it,* i. e., in the shape of the final article, appellant's invention does not distinguish, insofar as defining the rib as new structure, over the article of Speidel.

Although we possibly need not discuss it, we have also decided that appellant's arguments concerning the teaching of the Speidel patent are not supported. We think that a fair reading of the disclosure of the patent as a whole supports the board's "opinion" that:

> while most of the displaced metal would flow into the mold cavity 25 (Fig. 8), some will unavoidably flow to the right of said cavity and go toward the formation of reinforcing rib 6. Thus, the forming of the reinforcing rib 6 will absorb excess metal resulting from the forming of the score line as claimed, albeit not all of the displaced metal.

■ .Appellant has relied heavily on the suggestion of Speidel that the displacement of metal occurring during the formation of the score lines be compensated for by increasing the depth of the recess in the die in which the tear-out portion is formed. We think he is in error to draw from this the conclusion that "the tear-out portion 8 and only the tear-out portion 8 absorbs excess material." In any event, we have said many times that a reference disclosure must be evaluated for *all* that it fairly suggests and not only for what is indicated as preferred. In re Boe, 53 CCPA 1079, 355 F.2d 961, 148 USPQ 507 (1966). While Speidel does suggest that this would be desirable, he does not limit his disclosure to embodiments in which it could be argued all of the excess material flows one way.

■ And finally, we do not consider the Henchert patent to be "non-analogous art", the disclosure of which can only be combined with Speidel "to provide the Speidel can body with a *locking band* having a stacking rib offset radially inboard slightly of the double seam." (emphasis appellant's). It is obvious, we feel, that Henchert was cited not because it *specifically* suggests the combination but, as indicated in the Examiner's Answer, to show lack of novelty, per se, in the concept of extending a rib (which we consider to be, by nature, a reinforcement) through a tear-out portion of a can top. Having established that this knowledge was in the art, the examiner could then properly rely, as put forth by the solicitor, on a conclusion of obviousness "from common knowledge and common sense of the person of ordinary skill in the art without any specific hint or suggestion in a particular reference." The test for obviousness is not whether the features of one reference may be bodily incorporated into the other to produce the claimed subject matter but simply what the combination of references makes obvious to one of ordinary skill in the pertinent art. In re Mapelsden, 51 CCPA 1123, 329 F.2d 321 (1964). In re Henley, 44 CCPA 701, 239 F.2d 399 (1956). The decision of the board of appeals is affirmed.

Affirmed.